## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.          ) | Criminal No. 19-cr-350 |
| GARY LEE PEKSA,          ) | |
|          Defendant.     ) | |

### UNITED STATES' SENTENCING MEMORANDUM

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this memorandum to aid the Court in its sentencing proceeding.

### I.     Background

Beginning around October 11, 2018, the Library of Congress ("LOC") network security operations center ("SOC") notified investigators of web traffic on the LOC public wireless access system ("LOC guest WiFi") that triggered various alerts within the system due to internet browsing associated with keywords, definitions, and terms frequently related to child pornography and the sexual exploitation of children.  When investigators reviewed the logs of connections to the LOC WiFi that triggered these alerts, the connections were made by an Android device, which was confirmed to belong to the Defendant, with the identifier in the examples below:

| | | | | |
|---|---|---|---|---|
| 2018-10-12 | 05:31:35 | Issued 172.31.0.236 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |
| 2018-10-11 | 14:16:04 | Issued 172.31.6.124 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |
| 2018-10-11 | 05:33:21 | Issued 172.31.12.45 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |
| 2018-10-09 | 13:14:49 | Issued 172.31.13.157 | android-9026c71a29818b25 | |
| 2018-10-09 | 10:27:31 | Issued 172.31.13.157 | android-9026c71a29818b25 | |

| 2018-10-09 | 08:38:08 | Issued 172.31.13.157 | android-9026c71a29818b25 | |
| 2018-10-09 | 05:37:39 | Issued 172.31.13.157 | android-9026c71a29818b25 | |
| 2018-10-05 | 12:17:10 | Issued 172.31.11.175 | android-9026c71a29818b25 | |
| 2018-10-05 | 05:36:10 | Issued 172.31.10.197 | android-9026c71a29818b25 | |
| 2018-10-04 | 12:52:41 | Issued 172.31.9.137 | android-9026c71a29818b25 | |
| 2018-10-04 | 05:34:43 | Issued 172.31.15.140 | android-9026c71a29818b25 | |
| 2018-10-03 | 07:24:17 | Issued 172.31.9.138 | android-9026c71a29818b25 | |
| 2018-10-03 | 05:34:45 | Issued 172.31.9.138 | android-9026c71a29818b25 | |
| 2018-10-02 | 13:06:54 | Issued 172.31.0.127 | android-9026c71a29818b25 | |
| 2018-10-01 | 14:16:34 | Issued 172.31.13.56 | android-9026c71a29818b25 | |
| 2018-10-01 | 07:39:55 | Issued 172.31.1.188 | android-9026c71a29818b25 | |
| 2018-10-01 | 05:35:16 | Issued 172.31.2.127 | android-9026c71a29818b25 | |
| 2018-09-28 | 05:36:24 | Issued 172.31.10.97 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |
| 2018-09-27 | 13:04:47 | Issued 172.31.5.226 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |
| 2018-09-27 | 07:53:44 | Issued 172.31.3.70 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |
| 2018-09-27 | 05:29:47 | Issued 172.31.3.70 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |
| 2018-09-26 | 09:17:03 | Issued 172.31.4.153 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |
| 2018-09-26 | 05:38:52 | Issued 172.31.6.50 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |
| 2018-09-25 | 14:16:16 | Issued 172.31.4.30 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |
| 2018-09-25 | 06:40:55 | Issued 172.31.2.163 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |
| 2018-09-25 | 05:35:58 | Issued 172.31.2.163 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |
| 2018-09-14 | 14:16:58 | Issued 172.31.11.24 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |
| 2018-09-14 | 08:24:56 | Issued 172.31.4.85 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |
| 2018-09-14 | 05:39:31 | Issued 172.31.4.85 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |
| 2018-09-13 | 13:25:43 | Issued 172.31.4.241 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |
| 2018-09-13 | 07:04:25 | Issued 172.31.15.73 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |
| 2018-09-13 | 05:34:13 | Issued 172.31.15.73 | android-9026c71a29818b25 | 9c:d9:17:f6:1f:f6 |

The identifier in the far right column, 9c:d9:17:f6:1f:f6, represents the Android's media access control address ("MAC address") which is unique to the Defendant's phone. It should be noted that thirteen of the thirty-two connections depicted above occurred at approximately 5:30 a.m. The LOC buildings are not accessible to the public until 6:30 a.m. Only three populations access the LOC buildings during non-standard business hours: U.S. Capitol Police Personnel, Architect of the Capitol ("AOC") employees, and LOC employees with unique job requirements. The Defendant worked for the AOC.

On October 15, 2018, investigators were alerted that the Defendant's Android was detected on the LOC guest WiFi around 5:30 a.m., then again at 10:25am, triggering alerts associated with internet browsing of suspected child pornography and child sexual abuse material, from the WAP at LJ-159. Investigators responded to LJ-159, but did not observe anyone in the hallway. They then proceeded into the men's restroom, where investigators observed two individuals occupying separate stalls. An individual emerged from one of the stalls wearing a LOC identification badge identifying him as a materials handler for the LOC Library Events Office.  Later, the second individual emerged from a men's restroom stall wearing an AOC uniform consisting of a light blue, long sleeve, AOC work shirt and blue cargo style work pants. Investigators observed the individual was Caucasian, approximately 45 – 55 years of age, stocky, thick build, about 5'10" tall, with longer, gray in color hair and a mustache, but could not identify his LOC identification badge. No one else entered or exited the men's restroom.  Investigators reviewed badge entry access logs which revealed that Gary Lee Peksa, the Defendant, used his badge to access a badge-only elevator.  The Defendant was the second individual investigators observed exiting the bathroom, who had been using his phone to access child sexual abuse material.

Investigators also obtained five digital images from surveillance camera footage of employees departing the LOC from the C Street exit around 2:18 p.m. on October 15, 2018. The Defendant was seen in this surveillance footage, and law enforcement learned that he was a sheet metal mechanic for the AOC. For the next several days, investigators continued to match up the use of the Defendant's Android to access illegal websites with the Defendant's movements inside the building, which were captured on surveillance video.  It was learned that the Defendant consistently used his Android cellular device, and the public wireless internet at the Library of Congress, to access websites containing images and videos depicting the sexual abuse of children.  *See* Presentence Investigations Report ("PSR") at ¶15.  The investigation

confirmed that this Android was frequently accessing these websites on Monday through Friday, between the hours of 5:45 a.m. and 2:15 p.m. – which were the hours the Defendant worked.

On October 25, 2018, utilizing a list of internet uniform resource locators[1] ("URLs"), or web addresses, investigators used network traffic logs that contained the internet browsing activity that was linked to the Defendant's phone, and successfully downloaded over 1,00 files.  Investigators utilized the National Center for Missing and Exploited Children ("NCMEC") systems in order to search the hash values for the downloaded files with images identified by NCMEC as containing child abuse images depicting children known to law enforcement.  Twenty-seven of the images downloaded by investigators were matches for NCMEC records "associated with an image/video which appears to depict at least one (1) child previously identified by law enforcement".  A visual review of these files by investigators confirmed that they appear to contain visual depictions of children, engaging in sexually explicit conduct.  On November 14, 2018, investigators repeated this process for internet browsing activity associated with the Defendant's phone, and again identified additional images that appeared to depict the sexual abuse and exploitation of children.

On November 5, 2018, the Defendant used his cellular telephone, and the public wireless internet at the Library of Congress, to receive an image depicting a minor girl, between the ages of five and seven years old.  *Id.* at ¶18.  This child is laying on what appears to be a bed, and she is fully nude but for a pair of knee-high socks.  *Id.*  In this image, the child is inserting a pink, plastic object

---

[1] A Uniform Resource Locator (URL), colloquially termed a web address, is a reference to a web resource that specifies its location on a computer network and a mechanism for retrieving it. A typical URL could have the form http://www.example.com/index.html, which indicates a protocol (http), a hostname (www.example.com), and a file name (index.html).

into her vagina.  The file name for this image is "Naughty-young-blonde-doll.jpg."  *Id.* On that same date, the Defendant used his cellular telephone and the wireless internet at the Library Congress to receive an image showing a little girl, between the ages of four and six, laying on a bed.  *Id.*  This camera is zoomed in to focus on the child's face, and what appears to be an adult male penis is pressed against the child's lips.  *Id.* The file name for this image is "Cum-spray.jpg."  *Id.*

During the course of the investigation, law enforcement also obtained a Pen Register and Trap and Trace device ("PRTT") for the Defendant's residence. Information received pursuant to that PRTT revealed records of communications between the Defendant's house and numerous IP addresses confirmed to host sites offering individuals access to child pornography:[2] migel.com, i1iilo0.qc, thebest18-20.top, 18yoteen.com and endteen.com. Specifically, the records showed communications between the Defendant's residence and the IP address for migel.com, 31.148.99.24, on the evening of Monday, April 22, 2019, at a time when the Defendant would not be expected to be at work.

On July 29, 2019, the Defendant consented to a non-custodial interview conducted by investigators that was electronically recorded. The Defendant admitted that he used his cell phone to connect to three WiFi networks while at work as an AOC sheet metal mechanic.  He further admitted that while connected to the Library of Congress's wifi networks, he routinely went to a site known as "teen gate" to look at sexually explicit pictures because he was interested in "young teen girls."  The Defendant also said that he used search terms such as "teen so sweet", which directs him to "teen gate" where he would actively seek out and view images depicting minor females who are under the age of fifteen; later acknowledging

---

[2] PRTT data contains only timestamped IP address and port information, not complete URLs which would identify the specific content visited.

that most were closer to twelve to fourteen years of age. PSR at ¶15.   The Defendant admitted that in these images, the children are either shown fully nude or are captured in modeling-type images that evolve to fully nude images. Some are depicted engaging in acts involving sexual intercourse, which he viewed depending on his mood. Some of the images that the Defendant chose to view are little girls younger than twelve years of age who show obvious signs of prepubescence. *Id.*

While the Defendant said that he knew that it was against the law to view child pornography, he continued to do so.  *Id.* at ¶21.  The Defendant described his actions as an addiction similar to smoking cigarettes.  Through the years, however, the Defendant admitted that his viewing of child pornography had gotten "progressively worse," meaning he began viewing younger children depicted in images showing their sexual abuse, and that he engaged in more frequent viewing of the material.

During this interview, the Defendant said that he would start browsing on the "teen gate" website, using his cell phone while he was in his office.  *Id.* at ¶16.  He admitted that he would then go to a common storage space turned break room in the basement of the LOC Adams building, 120 Second Street SE, that "always locks" so that he could view and masturbate to child pornography. *Id.*  The Defendant also admitted that, daily, he used a certain bathroom inside the building, because it was more private than the bathroom closest to his office, and it allowed him to search out, view and masturbate to images depicting the sexual exploitation of children.  He identified himself in the surveillance photos investigators had gathered, and after being shown the logs of connections, the Defendant identified various addresses listed as the sites he would view, which contained images and videos depicting the abuse of children.  The Defendant said that while he was home, he would use his utilizes his personal laptop, a cellular phone, and his home wifi service to search for, and view, child pornography.

On July 29, 2019, the U.S. Capitol Police seized the Defendant's cellular phone.  *Id.* at ¶19. A forensic review of this device revealed 199 images depicting children exposing their genitals and/or engaging in sexual activity.  *Id.*  A description of some of these images follows:

> A. A white female infant, who is approximately 1-year-old, wearing a purple parka holding an adult erect penis in her right hand with the head of the penis in her mouth.
>
> B. A white female prepubescent child, who is approximately 4 years old, laying on her back wearing only a pink top which is pushed up above her belly button.  Her legs are spread, and an unidentified person is inserting a large flesh colored artificial penis shaped device into the child's vagina. The child appears to be crying.
>
> C. A white female child, approximately 2-years-old, who is completely nude and kneeling in front of an adult male.  The child is holding the adult male's erect penis with both hands, with her mouth around the head of the erect penis.
>
> *Id.*

On that same day, law enforcement seized the Defendant's laptop pursuant to a search warrant.  *Id.* at ¶20.  This device had 215 files that depicted little girls being sexually abused and assaulted.  *Id.*  The following are examples of the images located on the Defendant's laptop:

> A. Located in Users\gary\AppData\Local\Google\Chrome\User Data\Default\Cache – a white female child, approximately 5 years of age with blonde hair, holding an erect penis with her right hand and pressing the erect penis against her lips.

B. Located in Users\gary\AppData\Local\Google\Chrome\User Data\Default\Cache – a white female child, approximately 6 years of age, who laying on her back, fully nude, with her legs spread and her genitalia exposed. Above the child's pubic region the words 'FUCK ME' are written. At the top of the child's genital region is what appears to be a tattoo or drawing of a Playboy bunny. An erect male's adult penis is inserted into the child's vagina.

C. Located in unallocated space – a white male infant, approximately 8-10 months of age, laying on his back with a blue top and yellow pacifier in his mouth. The infant is not wearing any pants. The infant's legs are up and there is an erect penis that appears to be penetrating the baby's anus.

*Id.*

On October 16, 2019, a grand jury in the District of Columbia indicted the Defendant on two counts of Receipt of Child Pornography, in violation of 18 US Code § 2252(a)(2), and one count of Accessing Child Pornography with Intent to View, in violation of 18 US Code § 2252(a)(4)(b). *Id.* at ¶1. On October 21, 2019, the Defendant was arrested pursuant to an arrest warrant issued by the United States District Court for the District of Columbia. The defendant pled guilty to Receipt of Child Pornography on December 20, 2021. *See* PSR at ¶4. The government now files this Sentencing Memorandum, and respectfully requests that the Court impose a sentence of between 87 and 108 months, to be followed by 10 years supervised release. Sentencing is set for July 20, 2022.

## II.   A Sentence of 807 to 108  Months' Imprisonment Accurately Reflects the 3553(a) Factors

In determining a reasonable sentence, the Court must consider the factors listed in 18 U.S.C. § 3553(a).[3]  These factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed –
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and
(3) the kinds of sentences available;
(4) the applicable sentencing guidelines range for the offense;
(5) pertinent policy statements issued by the U.S. Sentencing Commission;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *see also United States v. Pyles*, No. CR 14-00006 (RJL), 2020 WL 376787, at *2 (D.D.C. Jan. 23, 2020); *United States v. Mitchell*, No. CR 05-00110 (EGS), 2019 WL 2647571, at *7 (D.D.C. June 27, 2019).  A district court, however, "need not consider every § 3553(a) factor in every

---

[7] Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005), the Guidelines serve only an advisory function. *Id.* at 245, 125 S. Ct. 738. Nevertheless, even in a post-*Booker* world in which the Guidelines are not binding, the sentencing court 'must calculate and consider the applicable Guidelines range" as its starting point.  And *Booker* did not change "how the Guidelines range is to be calculated." *United States v. Mattea*, 895 F.3d 762, 766 (D.C. Cir. 2018) (internal citations and quotations omitted).

case." *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008); *see also United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017).

### A.  The Nature and Circumstances of the Offense

There is no doubt that the Defendant's criminal conduct is extremely serious. His offenses have been perpetrated against the most vulnerable members of our society - children.  Children captured in images and videos depicting their sexual abuse are traumatized and victimized in the worst way imaginable at the time the images were created, and they are re-victimized and re-traumatized each and every time an individual, like the Defendant, views the images for their own sexual gratification. As eloquently explained by the Sixth Circuit in a child pornography case:

> ...we have numerous victims in a case like this, not one victim. Every image of a child, every image of a non-adult engaged in any type of sexual activity or any type of pose
>
> without clothing or any type of exploitation constitutes an additional case of victimizing a child. Without a demand for that type of information and that type of viewing from persons like this defendant, we don't know how many child abuse cases we could prevent. And as long as there is a demand to purchase images of child pornography, there is going to be an unending stream of child abuse of…children who are forced into
>
> these roles.
>
> ...every image has a child who has been exploited and abused, and that is the concern I have. It is the concern that I have when people are engaged in serially doing this, the effect it has on children throughout the world and the effect it has on their future lives.

*See United States v. Miller*, 665 F.3d 114, 121-122 (6th Cir. 2011)(quoting the district court) (rejecting an attack on the child pornography sentencing guidelines and highlighting the grave harm caused to the victims depicted in child pornography images and the evidence that traffickers and possessors of child pornography are the impetus for the creation of more sexual abuse of minors).

In the present case, this Defendant spent the hours that he should have been working searching websites for images and videos depicting the sexual abuse of young children. He would do so "daily" and would use breakrooms and bathrooms at his place of employment to masturbate to these materials that show the sexual assault of defenseless children as young as infants. Each one of the images found on a website that the Defendant viewed and downloaded represents an innocent child victim who had the worst moments of their lives forever memorialized and spread to countless offenders all over the world, thanks to the Internet. *See Blinkinsop*, 606 F.3d at 1118 (finding that "[t]he children involved in pictorial and cinematic pornography additionally endure ongoing harm because their images have been preserved in a permanent medium"). In *New York v. Ferber*, the U.S. Supreme Court noted:

> [P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography.

458 U.S. 747, 759 n.10 (1982), *quoting* Shouvlin, *Preventing the Sexual Exploitation of Children: A Model Act*, 17 Wake Forest L.Rev. 535, 545 (1981).

The conduct that brings this offender before the Court, which occurred numerous times over the course of nearly a year, demonstrate that the Defendant has a long-standing sexual interest and attraction to young, vulnerable children. Given the serious nature of the Defendant's criminal conduct, a Guidelines sentence is appropriate.

**B. History and Characteristics of the Defendant**

This offender stands before the Court having had opportunities that the majority of defendants do not. He stated that he had a "real good childhood;" familial support; and a supportive wife. *See*

PSR at ¶¶67, 68, 69, and 72.  He also had a good job for over 8 years, only being terminated for continually using his place of employment to commit internet crimes against children.  *Id.* at ¶95. Despite these advantages, the Defendant never voluntarily ceased his criminal activity, nor did he seek help before he knew that law enforcement had caught him red-handed.

The Government acknowledges that the Defendant has no prior criminal record.  However, his lack of a criminal history was accounted for when determining the applicable Guidelines range. Therefore, it should not serve as a reason to vary from a Guidelines sentence in this case.  Furthermore, as this Court is well-aware, the online sexual exploitation of children is a crime that is committed in secret.  This secrecy, combined with the overwhelming presence of digital devices and the near universal access to the internet, makes detection of these criminal offenses difficult.  This is illustrated by the facts and circumstances that brought this offender before the Court in the instant matter.  The evidence shows that the Defendant was searching out, downloading and viewing child pornography for a lengthy amount of time, both at work and at home, and yet his wife was "totally shocked" and "saw no sign of this." *Id.* at ¶74.  Over the course of less than a year, this offender was able to download and view hundreds and hundreds of images depicting very young children being orally and anally raped by adult men.

When dealing with these types of criminal offenses, the lack of an arrest record holds little significance because it is well-known that children often do not disclose sexual abuse, and that these types of crimes are wildly underreported.  *See United States v. Gregory Todd Numan*, 3:160cr000065(TMB)(DAK)(February 26, 2018:  Expert Testimony of Clinical Psychologist Darrell Turner).  In *Numan*, Dr. Turner provided expert testimony to the Court to explain why a

reliance on the lack of prior criminal history of an offender charged with sexual offenses committed

against children does not serve as a reliable indicator of their future risk for reoffending.  As

explained by Dr. Turner:

> "One of the main problems is the fact that these offenses are among the
> most undetected offenses that there are. This is not like bank robbery or
> murder, where it's generally assumed and expected that it's going to be
> detected and reported. We know from research that about only about five
> percent of sexual offenses against children are ever reported.
>
> Of those, of that five percent, about another five percent result in a
> conviction. So we're talking about an exponentially small number of
> offenses that are reported and accounted for. So it's sort of akin to saying
> there were only four drunk people in New Orleans in Mardi Gras this year
> because there were only four arrests for public intoxication, and it's not a
> good representation of what's actually going on out there. So to say it
> without the qualifier that hey, this is a gross underestimate, but you know,
> so far, this is what we've been able to find, I think, is misleading and very,
> very dangerous."

at pages 22-23.  *See also* K. London, M. Bruck, S. J. Ceci & D. W. Shuman, *Disclosure of*

*Child Sexual Abuse: What Does the Research Tell Us About the Ways Children Tell?*, 11

PSYCHOLOGY, PUB. POL'Y & L. 1, 194-226 (American Psychological Association, 2005)(finding in a

study of adult retrospective victim studies about child sex abuse, approximately 60 – 70% of adults

sexually abused as children did not recall disclosing the abuse during childhood);  *See also* D. W.

Smith, E. J. Letourneau, B. E. Saunders, D. G. Kilkpatrick, H. S. Resnick & C. L. Best, *Delay in*

*Disclosure of Childhood Rape: Results from a National Survey*, 24 CHILD ABUSE & NEGLECT 2, 273-

87 (2000)(the results of the study found that only 12% of child rape victims' assaults were reported to

law enforcement authorities.).

As such, the fact that the Defendant lacks a criminal record, given the ways in which these types of crimes are committed and the reluctance and inability of the victims to disclose, should be given less weight, given the nature of the offense he is currently charged with.

**C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and Provide Just Punishment for the Offense**

This factor is known as the "just desserts" concept, answering the need for retribution so that the punishment fits the crime and the defendant is punished justly. *See United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010). The *Irey* court cited the Senate Report regarding this provision:

> This purpose--essentially the "just desserts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense. (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

*Id.*

This Court should consider the very young age of the children depicted in the images that the Defendant sought out, downloaded, and viewed for his own sexual gratification when determining the appropriate sentence. *See United States v. Miller*, 665 F.3d, 123 114 (5th Circuit 2011); *see also United States v. Clogston*, 662 F.3d 558 (1st Cir. 2011); ("the [district court] rated this offense as serious (observing among other things that several of the images depicted sexual abuse of very young girls)); *United States v. Cunningham,* 2012 WL 593110 (6th Cir. Feb. 24, 2012); (affirming sentence where district judge reviewed all of the images to judge the defendant's conduct, and considered, as "the nature of those images, the age of the children, [and] the conduct depicted in the images" along with the other

14

3553 factors).  In this case, the Defendant engaged in this behavior daily, for multiple hours a day while both at home and at work, and he likened it to an addiction.

With respect to 18 U.S.C. § 3553(a)(2)(A), a sentence of between 87 and 108 months would provide "just punishment" for his offenses, promote respect for federal child exploitation laws, and reflect the seriousness of his offenses and child pornography offenses in general.  As this Court is well-aware, the distribution, receipt, transportation and possession of child pornography are particularly serious offenses, which has lifelong, devastating consequences for the children depicted in the child abuse material.  The Court need only review the Victim Impact Statements, which have been filed under seal, to understand the devastating impact that the distribution, receipt and possession, of child abuse material causes to the innocent children depicted in the images and videos, and the destruction and pain it causes to the parents and caretakers who love them. Once distributed over the Internet, images and videos depicting the sexual abuse of a child will circulate in perpetuity because individuals like the Defendant made a purposeful decision to seek out and view the material for their own sexual gratification.  The Defendant's viewing of this material contributed to the continuing trauma experienced by the abused children depicted in these images and videos.

Consumers of child pornography, like this Defendant, also create a market and demand for the production of these images and videos, which depict the sexual abuse and exploitation of real children. These consumers therefore contribute to the cycle of abuse and are in part responsible for the harm suffered by children used to produce the images and videos in their collections.  *See United States v. Goff,* 501 F.3d 250, 259-260 (3d Cir. 2007) ("Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography").  In *United States v. Goldberg,* the Seventh Circuit stated:

> The district judge was influenced by the erroneous belief that a sentence affects only the life of the criminal and not the lives of his victims.  Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded-both consumed himself and disseminated to others.  The greater the customer demand for child pornography, the more that will be produced. [Citations omitted].

491 F.3d 668, 672 (7th Cir. 2007).

Thus, even if consumers of child pornography do not themselves molest children, their actions contribute to the abuse of children.  Therefore, when considering this factor, a guidelines sentence, to be followed by ten years of supervised release, is appropriate.

## D.  The Need for the Sentence Imposed to Afford Adequate Deterrence

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence.  *See United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017) (the sentence would deter Fry and "others who may be inclined in doing similar kinds of things."); *see also United States v. Ferber*, 458 U.S. 747, 760 (1982) ("The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product"); *Osbourne v. Ohio*, 495 U.S. 102, 109-10 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand"); *United States v. Goff*, 501 F.3d 250, 261 (3rd Cir. 2007) ("Deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing."); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) ("Transporting and receiving child pornography increases market demand.  The greater

16

concern under the Guidelines is for the welfare of these exploited children.  The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it.").

18 U.S.C. § 3553(a)(2)(B) indicates that a sentence of 807-108 months is appropriate because the Defendant's sentence should be lengthy in order to deter the criminal conduct of others.  As stated in *Goldberg*, "[s]entences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor.  The logic of deterrence suggests that the lighter the punishment for trafficking in child pornography, the greater the customer demand for it and so the more will be produced."  491 F.3d at 672.  *See also Goff*, 501 F.3d at 261 (stating in a child pornography possession case that "deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing").

The Court is in the position to send a message loud and clear to those individuals like the Defendant who a have a morbid fascination and find sexual gratification in watching the sexual abuse of very young children.  This is a serious crime of violence and should be treated as such.

## E. The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant

A guidelines sentence is necessary in order to protect the public from further crimes of this Defendant.  It is important to note that sex offenders have a high rate of recidivism.  *See Lombard v. United States*, 44 F. Supp. 3d 14, 26 (D.D.C. 2014) (noting that the lower court's concerns about recidivism was supported by substantial authority (citing *Smith v. Doe,* 538 U.S. 84, 103, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) ("The risk of recidivism posed by sex offenders is frightening and high.") (citations omitted); *McKune v. Lile,* 536 U.S. 24, 33, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (noting that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender

to be rearrested for a new rape or sexual assault"); *United States v. Irey,* 612 F.3d 1160, 1214 (11th Cir.2010) ("[T]he threat of recidivism by a pedophile who has sexually abused a child is appalling.") (citation and quotation marks omitted); *United States v. Allison,* 447 F.3d 402, 405–06 (5th Cir.2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders.")); *see also United States v. Allison*, 447 F.3d 402, 405-406 (5th Cir. 2006) (Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders). Given all of the above, a sentence within the guidelines range, followed by a lengthy period of supervised release, is necessary to protect the public from future crimes committed by this Defendant.

### III.    **The PsychoSexual Evaluation and Risk Assessment Should Be Given No Weight**

The Court should not consider the Psychosexual Evaluation and Risk Assessment ("Evaluation"), prepared by Katherine Robinson, when fashioning an appropriate sentence for the Defendant, because the report relied exclusively on the Defendant's self-serving statements and because it is inconsistent with all of the evidence in this case. Importantly, it contradicts the Statement of Offense, which the Defendant agreed was accurate. When faced with statements that were false, the evaluator failed to appropriately confront the Defendant with the undisputed facts of the case. Instead, she chose to rely solely on his word. As such, her conclusions are not empirically based and completely unreliable.

While the United States Sentencing Guidelines permits this Court at Sentencing to consider "relevant information without regard to its admissibility under the rules of evidence applicable at trial," that information must have "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. §

6A1.3(a). *United States v. James,* Crim. No. 17-184 (RJL), 2019 WL2516413, at *1 (D.D.C. June 18, 2019) (noting that sufficient extrinsic corroboration was necessary before Court would consider evidence at sentencing). An expert's report may be excluded from consideration at Sentencing if it 1) "does not demonstrate or disclose sufficient facts or data on which [the expert's] conclusion is based"; 2) "does not disclose reliable principles and methods from which [the expert's] conclusion is drawn"; and 3) "does not demonstrate that [the expert] applied reliable principles and methods reliably to the facts of the case." *Estate of Gaither ex rel. Gaither v. District of Columbia*, Civ. No. 03-1458(CKK)(AK), 2008 WL 5869878, at *3–4 (D.D.C. July 30, 2008).

The District of Columbia Circuit's ruling in *United States v. Day* is also instructive on this issue. *See United States v. Day,* 524 F.3d 1361 (D.C. Cir. 2008). In *Day*, the court affirmed the District Court's decision to exclude expert testimony, due to the expert's failure to articulate what he "concluded from any individual test result, interview, or expert report," making it "virtually impossible for the Government to engage" with the evidence. *Id.* at 1371–72. In the present case, Katherine Robinson did not include accurate information to support her conclusion. Instead, this report was exclusively on the Defendant's self-reporting, which was not verified through the use of a polygraph. Ms. Robinson made the choice not to reach out to the Government for any relevant, reliable information. This Court is undoubtedly familiar with psychosexual evaluations that were traditionally completed by the Bureau of Prisons. The evaluations and associated reports authored by treatment providers at the BOP are far superior in quality to the rather sparse and subjective report issued in this case. That is because the evaluations conducted by the BOP are empirically based and include common tests with internal validity controls. In comparison, on the one test with internal validity controls, the Personality Assessment Inventory (which does not measure either antisociality or sexual deviance, which Ms. Robinson asserts

19

are the two broad sets of risk factors associated with sexual-offense recidivism), Ms. Robinson appears to completely ignore some disturbing data that came out of the validity scales. *See* Evaluation at pages 10, 7 and 8. With respect to impression management, which can be assumed to mean how the Defendant would like others to view him, the Defendant tends to portray himself in a consistently favorable light and as being relatively free of shortcomings that most individuals will admit. *Id.* at page 7. Some of his tendencies will likely lead him to minimize, or be unaware of other areas, where his functioning might be less than optimal. *Id.* at pages 7 and 8. In fact, the Evaluation suggests that his responses on the PAI should be interpreted cautiously. *Id.*

On the CPORT, Ms. Robinson deliberately made the choice to score the Defendant inaccurately. On the pedophilic or hebophilic interest measure, she scored the Defendant as a 0. *Id.* at page 10. She simply took the Defendant's word for it, rather than reviewing all of the facts and evidence in this case. She ignored the fact that this is an individual who admitted to seeking out, downloading and viewing child pornography for nearly a year. He admitted to viewing it and was obviously sexually gratified by it, because he masturbated to it daily. She failed to contradict him with statements in the PSR that indicated that he viewed images depicting children less than 12 years old, who showed signs of prepubescence. *See* PSR at ¶15. She didn't confront him with the fact that the two images specified in the Indictment and the Statement of Offense, depicted little girls between 4 and 7 being sexually abused by adults. *Id.* at ¶18. The same is tru]e for the hundreds of images found on his cellular phone and laptop, which depict children as young as infants and toddlers being anally and orally raped. *Id.* at ¶¶19 and 20.

This is a Defendant who sat through a haphazardly conducted evaluation, eager to make an impression on the final reader: The Court. There can be no doubt that he wanted to paint himself in the

best light possible, and to minimize the problems that he has that have certainly interfered with his ability to function.  The Defendant was fired from his job of eight years due to his compulsive behavior. Because Ms. Robinson never bothered to reach out to the Government, she didn't know that he had admitted to law enforcement that he knew what he was doing was illegal, but he didn't stop.  She had no idea that he described his criminal conduct as an addiction, or that he admitted that his viewing of child pornography had gotten progressively worse over the years, meaning that he was viewing it more often, and with children who were younger and younger.  For all of these reasons, it's clear that this report lacks the corroborative evidence necessary to allow the Court to sufficient rely on the conclusions it espouses.  Therefore, the Government asks that this Court exclude Katherine Robinson's report from consideration at Sentencing.

## IV.   <u>If Ms. Robinson's Report is Considered, it Should be Given Little Weight</u>

As stated above, it is readily apparent from the flimsy report that this "evaluation" contained nothing more than the Defendant's self-report, which was not verified through the use of a polygraph.  As noted by Judge Posner, "the best predictor of recidivism is not deportment at an interview but sexual interest in children." *United States v. Garthus*, 552 F.3d 715, 720 (7th Cir. 2011) *citing* R. Karl Hanson, Kelley E. Morton & Andrew J.R. Harris, "Sexual Offender Recidivism Risk: What We Know and What We Need to Know," 989 Annals of the N.Y. Academy of Sciences 154, 157 (2003) (tab.1). Ms. Robinson's report didn't include the relevant, empirically based tests that contain internal validity controls, such as: The Minnesota Multiphasic Personality Inventory, 2nd Edition, Restructured Form (MMPI-2-RF); The Correlates of Admitted Sexual Interests in Children (CASIC) tool or the Violence Risk Scale:  Sexual

Offender Version ("VRS")(which measure sexual deviancy); or  the Psychopathy Checklist Traits (PCL-R) (which measures antisociality).

Despite the fact that Ms. Robinson identified an impulsive, antisocial lifestyle and sexual deviance as the two broad sets of risk factors, she did not utilize any of the standard tests to measure either.  Rather, she concluded that he does not demonstrate the qualities that would make up a general pattern of antisocial personality. *See* Evaluation at page 10.  More disturbingly, she concludes that the Defendant does not demonstrate sexual deviance.  *Id.* Ms. Robinson defines this term to mean a pattern of documented, demonstrated interest in sexual behaviors that are illegal, including sex with pre-pubescent children, incest, or rape.  *Id.*  In the present case, there can be no doubt that the Defendant should have been identified as having this risk factor, given that he pled guilty to the Receipt of Child Pornography, and his criminal conduct lasted several months.  It strains credulity that Ms. Robinson could think that using the wifi at his place of employment, several times a day on a daily basis, to access images and videos that depict the sexual abuse of children who have been identified by NCMEC as victims, and then heading into a breakroom or public restroom to masturbate to those images is not sexually deviant behavior, nor an indication of his true sexual preference.  PSR ¶¶ 15 and 16.  It's unclear if Ms. Robinson was trying to mislead the Court, simply failed to do a comprehensive evaluation, or even worse dangerously believes that viewing thousands of images depicting the sexual abuse of children, including some which depict infant and toddlers being victimized, are not sexually deviant actions or indicative of a deviant sexual preference

As detailed above, there is simply no empirical, credible basis for the conclusion that Ms. Robinson reaches in her report that the Defendant is a low risk to reoffend.  Again, she did not administer any tests that are necessary to assess the Defendant's sexual deviance, nor any other psychological dysfunction. As

such, she has no basis other than a three-hour interview with the Defendant, which was not verified by comparing his statements to the evidence available in this case or to answers provided by the Defendant during the plea colloquy, upon which to base this conclusion.

This report hinges entirely on the Defendant's self-reporting.  Self-reporting is inherently unreliable, especially when an offender knows that his answers may impact the punishment he receives. For all of the reasons detailed above, this Court should either refuse to consider this report, or give it very little weight when fashioning the appropriate sentence for this offender.

**V.**      **The Victims are Entitled to Restitution**

In child pornography cases, restitution is mandatory to any person "harmed as a result of" a defendant's crime pursuant to 18 U.S.C. § 2259. *See* 18 U.S.C. § 2259(a), (c); *see also United States v. Monzel*, 930 F.3d 470, 476 (D.C. Cir. 2019); *United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015) ("Pursuant to 18 U.S.C. § 2259, the victims of certain federal crimes, including possession of child pornography, are entitled to mandatory restitution."). Restitution includes "the full amount of the victim's losses," which may include any costs incurred by the victim for:

(A) Medical services relating to physical, psychiatric, or psychological care;

(B) Physical and occupational therapy or rehabilitation;

(C) Necessary transportation, temporary housing, and child care expenses;

(D) Lost income;

(E) Attorneys' fees, as well as other costs incurred; and

(F) Any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(a), (b)(3); *see also United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015).

Here, the offense of conviction is a child pornography trafficking offense, as defined in 18 U.S.C. § 2259(c)(3). Therefore, the Court shall determine the full amount of the victim's losses and shall order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is not less than $3,000. 18 U.S.C. § 2259(b)(2).   The Government has attached a proposed Restitution Order to this Memorandum as Exhibit A.

In *Paroline v. United States*, 134 S. Ct. 1740 (April 23, 2014), the United States Supreme Court faced a circuit split over the interpretation of 18 U.S.C. § 2259, specifically over "how to determine the amount of restitution a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed." *Paroline*, 134 S. Ct. at 1716. In *Paroline*, the defendant possessed two images of the victim who was seeking restitution. The Court's answer to this question involved three steps.

First, *Paroline* held that, because the statute defined a "victim" as someone "harmed as a result" of the offense, restitution under § 2259 was proper "only to the extent the defendant's offense proximately caused a victim's losses." *Id*. at 1722.

Second, the Court held that "proximate cause" under § 2259 did not require strict but-for causation. *Id*. at 1726-27. Recognizing that under the circumstances of most child pornography possession cases – where losses resulted from harm caused by the trafficking of a victim's images by numerous "geographically and temporally distant offenders acting independently, and with whom the defendant had no contact," *id*. at 1725, - the Court held:

> In this special context, where it can be shown that a defendant possessed a victim's images and that a victim had outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259 should order restitution in an amount

that comports with the defendant's relative role in the causal process that underlies the victim's general losses.

*Id*. at 1727. The Court made clear that, where the victim's losses are "the product of the acts of thousands of offenders," a restitution order should not be "too severe" but must not be merely "a token or nominal amount." *Id.* That is, in part, because a restitution order under § 2259 serves "twin goals," the first being to "help[] the victim achieve eventual restitution for all her child-pornography losses" and second to "impress[] upon offenders the fact that child pornography crimes, even simple possession, affect real victims." *Id.*

Third, the Court provided sentencing courts the following guidance for how to determine the proper amount of restitution under this standard. *Id*. The Court noted that a sentencing court's goal should be to assess "the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses," taking into account any "available evidence." *Id*. at 1727-28. The Court emphasized that there is no "precise mathematical inquiry" governing this determination and that district courts must exercise "discretion and sound judgment" in fashioning restitution awards. *Id*. at 1728. The Court suggested several factors to be considered, including: (1) the number of defendants convicted of possessing the victim's images; (2) the number of future offenders likely to be caught and convicted; (3) whether the defendant had any role in the initial production of the images; (4) whether the defendant reproduced or distributed the images; (5) how many images the defendant possessed; and (6) "other facts relevant to the defendant's relative causal role." *Id*. "These factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders. They should rather serve as rough guideposts for determining an amount that fits the offense." *Id*.

Congress has since amended Section 2259 to both codify *Paroline*'s basic approach and to set a restitution floor of $3,000. *See* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299, 132 Stat. 4383 (2018).  As detailed in the victim impact statements and requests for restitution that were filed under seal with the Court, some of the victims depicted in the images and videos the Defendant sought out, downloaded, viewed and possessed, are seeking restitution for costs associated with attending psychotherapy and/or counseling, medications, loss of child support, loss of income, tracker phone(s) for protection, expenses for maintaining a PO box to avoid harassment, loss of housing, annual HIV and STD testing, and for various medical expenses incurred as a result of the defendant's actions.  The Government has reviewed these restitution requests and believes that five of these victims, including:  April, Jane/Cinderblock Blue, Jenny, Sarah/Marineland 1, and Sierra/Jan Sock, are all entitled to restitution.  For the reasons set forth above, the government respectfully requests that the Court shape an appropriate restitution award, in amounts consistent with those on the Proposed Restitution Order attached as Exhibit A, be paid by the Defendant.

## VI.    <u>Conclusion</u>

The Government submits that a sentence of imprisonment of 87 to 108 months, followed by a term

of ten years supervised release, is a reasonable sentence in this case and is "sufficient, but not greater than necessary to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).

Dated:  July 13, 2022                              Respectfully submitted,

                                                   MATTHEW M. GRAVES
                                                   UNITED STATES ATTORNEY


                                                     /s/   *Amy E. Larson*

                                                   Amy E. Larson, N.Y. Bar Number 4108221
                                                   Assistant United States Attorney
                                                   601 D. Street N.W.
                                                   Washington, D.C. 20530
                                                   Telephone: (202) 252-7863
                                                   Email: Amy.Larson2@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing.

_/s/_ _Amy E. Larson_____

Amy E. Larson